ACCEPTED
05-14-01151-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
4/2/2015 9:53:55 AM
LISA MATZ
CLERK

## NO. 05-14-01151-CV

## IN THE COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS
## DALLAS, TEXAS

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
4/2/2015 9:53:55 AM
LISA MATZ
Clerk

### AXCESS INTERNATIONAL, INC.

**Appellant,**

**v.**

### BAKER BOTTS L.L.P.

**Appellee.**

ON APPEAL FROM COUNTY COURT AT LAW NUMBER FIVE, DALLAS COUNTY, TEXAS
CAUSE NO. CC-13-01301-E
THE HONORABLE MARK GREENBERG PRESIDING

### Joint Stipulation Regarding Court Reporter's Record

**TO THE HONORABLE COURT OF APPEALS**

Appellant, Axcess International, Inc., and Appellee, Baker Botts L.L.P., jointly stipulate as follows:

1. In preparing the official Court Reporter's Record that has been filed with the Court, the court reporters did not transcribe certain testimony presented by video deposition. The parties have agreed to supplement the record by stipulating to the missing testimony of these witnesses.

1

2.      Specifically, the parties stipulate that the deposition excerpts attached as TABS 1- 6 accurately reflect the deposition testimony that was played for the jury by video during trial, as indicated below:

| Witness | Called by | Court Reporter's Record location | Stipulated attachment |
| --- | --- | --- | --- |
| Michael Marcin | Axcess | Vol. 10B, Page 93, Line 1 | TAB 1<br><br>Page/lines 6:7 – 25:2 |
| Michael Marcin | Baker Botts | Vol. 10B, Page 93, Line 8 | TAB 2 |
| Michael Marcin | Axcess | Vol. 10B, Page 93, Line 13 | TAB 3<br><br>Page/lines 89:12 – 92:4 |
| Wayne Steeves | Baker Botts | Vol. 14B, Page 18, Line 3 | TAB 4 |
| Michael Beber | Baker Botts | Vol. 14B, Page 21, Line 21 | TAB 5 |
| Raj Bridgelall | Baker Botts | Vol. 14B, Page 24, Line 18 | TAB 6 |

3.      The parties further stipulate that Plaintiff's Exhibits 163-170 and 173-176 were demonstrative exhibits only and were not admitted into evidence.

Dated: April 2, 2015

Respectfully submitted,

/s/ Paul M. Koning

Paul M. Koning
  Texas Bar No. 11671300
Brent E. Basden
  Texas Bar No. 24047828
KONING RUBARTS LLP
1700 Pacific Avenue, Suite 4500
Dallas, Texas  75201
Tel:  (214) 751-7900
Fax:  (214) 751-7888
paul.koning@koningrubarts.com
brent.basden@koningrubarts.com
*Attorneys for Appellee Baker Botts L.L.P.*

/s/ Steven E. Aldous

Steven E. Aldous
  Texas Bar No.
Forshey Prostok, LLP
500 Crescent Court, Suite 240
Dallas, TX 75201
saldous@forsheyprostok.com

Jonathan T. Suder
  Texas Bar No.
Friedman, Suder & Cooke
Tindall Square Warehouse No.1
604 East 4th Street, Suite 200
Fort Worth, Texas 76102
jts@fsclaw.com
*Attorneys for Appellant Axcess
International, Inc.*

3

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 2nd day of April 2015, a true and correct copy of the foregoing was delivered to all attorneys of record via electronic service in accordance with the Texas Rules of Appellate Procedure, as follows:

Steven E. Aldous
**FORSHEY PROSTOK, LLP**
500 Crescent Court, Suite 240
Dallas, Texas 75201

Jonathan T. Suder
Michael T. Cooke
Glenn S. Orman
**FRIEDMAN, SUDER & COOKE**
Tindall Square Warehouse No. 1
604 East 4th Street, Suite 200
Fort Worth, Texas 76102

/s/ Paul M. Koning

Q.    Good morning, Mr. Marcin.    09:02

A.    Good morning.    09:02

Q.    Can you state your name for the record?    09:02

A.    Michael J. Marcin.    09:02

Q.    What's your current occupation?    09:02

A.    I am an attorney.    09:02

Q.    What kind of attorney are you?    09:02

A.    I am a patent attorney.    09:02

Q.    What firm are you currently with?    09:02

A.    Fay Kaplun & Marcin.    09:02

Q.    How long have you been with this firm?    09:02

A.    Since June of 2000.    09:02

Q.    Could you generally describe what your job responsibilities are as a patent attorney?    09:02

A.    Generally I prosecute patent applications in front of the United States Patent and Trademark Office, which comprises normally taking a disclosure from an inventor, putting that disclosure into a patent application, filing that    09:02

TAB 1

M. J. Marcin, Esq.

patent application with the United States Patent and Trademark Office, and then having a general back-and-forth with the patent office during what we call the prosecution phase in order to hopefully have the patent office allow the patent application as a patent.

Q. We will talk a little bit more about that in a second.

Can you just briefly outline your educational history starting with college?

A. Sure. I went -- I have a bachelor of science in electrical engineering from the University of Pennsylvania, and I have my law degree from Fordham University.

Q. And how long have you been practicing patent prosecution?

A. I started while I was in law school in 1996, and I have been doing it ever since.

Q. How does the electrical engineering degree you got in undergrad play into patent prosecution?

A. Normally when we speak with the inventors, they are typically engineers or other technical people, and so it plays into the fact

M. J. Marcin, Esq.

that we speak the language that they speak, technical language, and it allows us as I said to take what they described to us and write that down in a way hopefully that an ordinary person reading the patent can understand.

Q. What kinds of patents have you helped prosecute in your time at your current firm?

A. I generally focus on the electrical arts and computer science arts. So it could be anything from, you know, RFID technology, radio frequency identification technology, mobile telecommunications technology, computer software, operating systems, networking applications, and also what we call business method patents which are -- generally the best way to describe them would be the Internet applications that most of us are used to.

Q. I would like to talk to you a little bit about the work you did for my client Axcess at this point.

How did you come to represent Axcess International in prosecution matters?

A. So I don't remember exactly how Axcess was initially referred to me, but I recall that my

M. J. Marcin, Esq.

initial contact was with Raj Bridgelall who called me on the phone and interviewed me for approximately a half hour.  Part of that interview was to discuss generally what Axcess was looking for and also my experience in their technical field, and as I said, that lasted about half hour and then about a week later Raj called me back and said they decided to retain us for their patent prosecution work.

Q.    What was your job relative to Axcess? What were they asking you to do?

A.    So Axcess -- I don't remember the exact number, but they had about 12 patent families. Some of these were already issued as patents.  Some of them were still in the patent office being prosecuted, and what they wanted us to do was to continue to prosecute those patent applications that were in the patent office and generally advise them on all their patent prosecution matters.

Q.    I am going to show you what's previously been marked in this case as Exhibit 165.

Do you recognize that document, sir?

A.    I do.

Q.    What is it?

M. J. Marcin, Esq.

A.    It's a patent that is owned by Axcess.    09:06

Q.    And was this one of the patents that you    09:06
reviewed when Axcess hired you?    09:06

A.    This is a patent I reviewed.  I did not    09:06
prosecute this patent.  It was prosecuted or it was    09:06
issued as a patent prior to my representation of    09:06
Axcess.    09:06

Q.    What significance did that patent play    09:06
during the prosecutions?    09:06

A.    So this particular patent was one of the    09:07
patents that there were -- there was a continuation    09:07
application filed in this case, and what Axcess had    09:07
asked me to do was to work on that continuation    09:07
application and in fact, file a further    09:07
continuation application to get different claims    09:07
scope in a new patent.    09:07

Q.    I would also like to show you what's    09:07
previously been marked as Exhibit 167 in this case.    09:07

Do you recognize this document, sir?    09:07

A.    Yes, I do.    09:07

Q.    What is this document?    09:07

A.    This is another patent that is in the    09:07
same family, and this is a patent based on an    09:07

M. J. Marcin, Esq.

application that was again filed by a different 09:07 firm that was issued. 09:07

Q. Was this part of the patent family that 09:08 you referenced earlier for Axcess? 09:08

A. Yes, it was. 09:08

MR. ORMAN: And then I would like to 09:08 mark this as Exhibit 310. 09:08

(Exhibit 310, 868 patent, marked for 09:08 identification, as of this date.) 09:08

Q. Do you recognize this document, sir? 09:08

A. Yes, I do. 09:08

Q. What is this? 09:08

A. This is a further patent from the same 09:08 family that I described before, and this is a 09:08 patent based on an application that I filed -- our 09:08 firm filed for Axcess. 09:08

Q. And you mentioned a continuing 09:09 application. Can you explain what a continuing 09:09 application is? 09:09

A. I will try. A continuation application 09:09 is an application that is filed after the original 09:09 application. Patent applications generally have 09:09 three parts to them. The three parts are the 09:09 drawings, the description, and the claims. The 09:09

M. J. Marcin, Esq.

drawing -- in a continuation application, the drawings and the claims remain the same but you are allowed to file different claims that can look the same or they look a little bit different to go for different claim scope.  The only rule is that they must be supported by those original drawings and those original claims and the give up is that you have a -- what we call a priority date that goes back to the original application, and why that is important is that your patent is good from the day of issue of the patent until 20 years from the filing date or the priority date so when you file a continuation application, you are giving up some time when you are issued patent -- when a patent from the continuation application issues.

Q.    I will mark what we will call the 868 patent as Exhibit 310.

Was this a continuing application?

A.    Yes, it was.

Q.    It's one that you processed for Axcess?

A.    Yes, it was.

Q.    Generally, what are the benefits of getting a continuing application?

M. J. Marcin, Esq.

A.    There are different reasons why applicants file continuation applications.  One reason could be that they are unhappy with the claims scope in the original application or any other continuation applications or not necessarily unhappy but they would like a different claims scope in the continuation application.  The other reason is since the continuation application is normally filed for several years after the original application, it allows the applicant to understand how the industry or how the products are -- that the patent covers are being developed or being used and it allows them to write claims that are more directed to the products that are in the marketplace.

Q.    And you mentioned that a client may be able to write claims directed toward the marketplace.  Why would a client want to do that?

M. J. Marcin, Esq.

Q.    You can answer.                                09:11

A.    I apologize.  Can you repeat the               09:11
question?                                            09:12

Q.    You mentioned something about being able       09:12
to kind of watch the marketplace develop.  Why      09:12
would a continuation help that for a client?         09:12

A.    So the client has invented the subject         09:12
matter that is in the patent, but the claims may be  09:12
written in such a way where it's not entirely clear  09:12
that what is in the products in the marketplace --   09:12
the claims are written in such a way as to cover     09:12
the products in the marketplace even though the      09:12
client has invented that subject matter.  So the     09:12
rewriting of the claims in the continuation          09:12
application allows the client to have more directed  09:12
claims at those products, which could allow the      09:12
client to do several things such as license the      09:12
manufacture of that -- of the product in the         09:12
marketplace or sue them for infringement of their    09:12
patent.                                              09:13

Q.    I believe a little earlier you mentioned       09:13
priority date.  Can you explain what priority date   09:13
is?                                                  09:13

M. J. Marcin, Esq.

A.    So in general, we refer to the priority date as the filing date of the application and that is generally when your right -- when your right starts with respect to the patent with respect to others who may file -- who may file later applications.  So priority dates are important when there are later filed patents in the same area.

Q.    What is the priority date of the 868 patent that's been marked as Exhibit 310?

A.    So actually, in a continuation application, the priority date goes back to the earliest patent application.  So when the 868 patent was filed on October 27, 2009, that is, in fact, not the priority date for the 868 patent.  It goes back to the filing date of the original parent application which is the 7,005,985 patent which is July 20, 1999.

Q.    What patents did you review on behalf of Axcess as part of your representation relative to this continuing application?

A.    Relative to this family of applications?

Q.    Yes.

A.    So I -- at the point that I took over representation of this family, the 985 patent was

M. J. Marcin, Esq.

already issued, and I would have completely read that and its file history.  The second patent in the family, which is the 886 patent, I took over the representation of that application after it had been allowed so I would have read the -- again, the complete file history of that patent, and then with respect to the 868 patent, I would have -- since I prosecuted this application and filed it, I would have read the complete file -- the complete specification prior -- prior to filing the application.

Q.  And what's the general subject matter of the 985 patent?

A.  Of the 985 patent?  Well, it is radio frequency identification tags and systems.  The claims -- I would have to look at them exactly, but I believe the claims are generally directed at the idea of there being a primary tag and that primary tag being loaded with identifications of secondary tags.

Q.  And what is your understanding as to what Axcess was hoping to accomplish in getting the continued application of the new patent?

M. J. Marcin, Esq.

A.    So my recollection is that when I first 09:15 came on, Axcess identified this family as an 09:16 important family for them, and one of the things 09:16 that I did when I initially got it, I read the 09:16 entire application and tried to understand it as 09:16 best I could.  Then I spoke to Raj Bridgelall and 09:16 he explained that they did not believe that the 09:16 claims that issued in the 985 patent were directed 09:16 at the subject matter that they thought was the, in 09:16 fact, their invention and/or was the main portion 09:16 of their invention.  He explained to me what he 09:16 thought the invention was and what they would like 09:16 the claims to be directed at.  I re -- I understood 09:16 that, I drafted a set of claims directed toward 09:16 that invention.  I made sure in conjunction with 09:16 them that those claims were supported by the 09:17 specification and drawings of the 985 patent or the 09:17 originally filed application that led to that 09:17 patent, and then after that, we filed the 09:17 application that led to the 868 patent and the 09:17 general subject matter that they were -- they were 09:17 trying to cover was the idea of a dual frequency 09:17 radio identification tag. 09:17

Q.    I would like to show you what's been 09:17

M. J. Marcin, Esq.

previously marked in this case as Exhibit 25. 09:17

Can you take a look at that? Do you 09:17
recognize this document? 09:17

A. Yes, I do. 09:17

Q. And what is it? 09:17

A. This is a patent that is on its face 09:17
owned by Savi Technology. 09:17

Q. How do you recognize this document? 09:17

A. So when I -- as I was explaining before, 09:17
when I was tasked to write the continuation 09:17
application with respect to the dual frequency 09:18
identification tags, one of the -- one of the other 09:18
parameters that was discussed with me was the fact 09:18
of covering other people -- other corporations' 09:18
technology in the field, and one of the companies 09:18
that was mentioned was Savi and they -- the way 09:18
they described or the way Axcess described the Savi 09:18
technology to me was to give me this patent and say 09:18
that this is how they believe the Savi technology 09:18
worked as described in this patent, and so one of 09:18
the -- one of the tasks was to cover what was 09:18
inside this or what was described in this patent. 09:18

Q. If you could get the 868 patent back in 09:18
front of you, it's what we marked as 310. 09:18

M. J. Marcin, Esq.

A.    Yes.                                              09:18

Q.    Were you able to get a patent for              09:18
Axcess?                                                09:19

A.    Yes.                                            09:19

Q.    And is it this patent?                          09:19

A.    It is this patent, yes.                         09:19

Q.    What does the 868 patent cover?                09:19

A.    It generally covers the dual frequency         09:19
radio identification tags.                             09:19

Q.    And what priority date does the 868           09:19
patent have?                                           09:19

A.    As I explained before, it has the             09:19
priority date of the 985 patent, which is July 20,    09:19
1999.                                                  09:19

Q.    How does that priority date compare to        09:19
the Savi 114 patent?                                   09:19

A.    So the priority date of the Savi 114          09:19
patent, it was filed on April 24, 2001.  It claims    09:19
priority to a provisional application that was        09:19
filed on September 7th of 2000.  So the earliest      09:19
possible priority date for the Savi patent would be   09:19
September 7th of 2000.                                 09:19

Q.    And the 868 patent's priority date would     09:19

M. J. Marcin, Esq.

be?                                                        09:20

A.    July 20, 1999.                                       09:20

Q.    So the 868 patent would have an earlier          09:20
priority date than the Savi patent?                        09:20

A.    That's -- yes, that is correct.                     09:20

Q.    Now, during the prosecution of this              09:20
patent, I believe you mentioned there is a                 09:20
back-and-forth with the Patent Trademark Office?           09:20

A.    Yes.                                                09:20

Q.    Can you explain a little bit about what          09:20
the process was like in terms of getting the 868           09:20
patent and your communications with the Patent and         09:20
Trademark Office?                                          09:20

A.    So I could explain to you the typical            09:20
path that a patent application goes.  I don't              09:20
recall all the specifics of the 868 patent.                09:20

Q.    That's fine.                                        09:20

A.    So normally when we file a patent               09:20
application, we file it with claims that have a            09:20
scope that is probably broader than we will                09:20
eventually get in the issued patent, and I think           09:20
the way that I always like to describe this to             09:20
clients is that the technology in an area is a             09:21

M. J. Marcin, Esq.

brick wall and there is a hole in that brick wall and your patent is going to be a brick that fills in that hole and what we like to do is write the claims such that the brick is a little bit bigger than the hole and therefore, during prosecution we will whittle down that brick so it fits in tight to the hole and fill the entire hole rather than write a claim that's a very small brick and leave space in that hole because if you are entitled to fill that entire hole, you should fill the entire hole.

So the way this normally works is that you file your application with your claims in the patent office. The patent examiner will examine the patent application and the claims and normally send you what we call a rejection. There is different types of rejections, but the normal ones that we deal with are what we refer to as anticipation or obviousness rejections based on prior art. Prior art are other applications -- other patent application publications, other patent documents or anything that's written in journals or the newspaper or anything regarding the subject matter in the patent application.

And then after we receive this

M. J. Marcin, Esq.

rejection, we will either write an argument to the 09:22 patent examiner saying why the examiner is wrong 09:22 and our claims should be allowable, or we can also 09:22 what we call amend the claims which is change your 09:22 scope a little and also make an argument as to why 09:22 this changed scope gets us around the prior art. 09:22 These objections can come multiple times. It's 09:22 very typical in a case to have three or more of 09:22 these rejections until ultimately you end up with a 09:23 -- with an allowance. 09:23

The other thing that happens is 09:23 sometimes we will have interviews with the examiner 09:23 where we will talk to the examiner about the case 09:23 and get his understanding of why he is rejecting 09:23 the claims, make our arguments over the phone or in 09:23 person with the examiner, and it's basically a 09:23 back-and-forth talk with the examiner to attempt to 09:23 understand and maybe work out some claim language 09:23 that will be allowable. 09:23

Q. And just so I understand, you mentioned 09:23 a rejection. That's a pretty harsh-sounding word, 09:23 but is rejection a common part of the patent 09:23 prosecution practice? 09:23

M. J. Marcin, Esq.

A.    Yes, it is and in fact, as I described    09:23
before, we generally find it not in our clients'    09:23
best interest to get what we call a first office    09:23
action allowance because that usually means that we    09:24
drafted the claims too narrow and that we were    09:24
entitled to a broader scope of protection.  So we    09:24
typically would like a rejection so we can figure    09:24
out exactly what the client is entitled to.    09:24

Q.    So if you get a rejection, that doesn't    09:24
mean that you can't get a patent?    09:24

A.    No, it does not.  I would say that -- I    09:24
don't have the exact statistics, but it would not    09:24
shock me that over 99.5 percent of all issued    09:24
patents receive a rejection at some point.    09:24

Q.    And if you would pull out the 868 patent    09:24
and go to the last page and look at the claims, can    09:24
you describe generally what the subject matter of    09:24
the claims of the new Axcess patent are?    09:24

A.    So as I said before, it is generally    09:24
directed at -- there are two independent claims.    09:24
The first is a method claim, and that's a method of    09:25
operation of a radio frequency tag having dual    09:25
frequency, and the second independent claim is    09:25

M. J. Marcin, Esq.

directed to a radio frequency identification tag having dual frequency.

Q.    And how do those claims compare to the Savi patent that you reviewed?

A.    The claims, to the best of my recollection, cover some of the subject matter that is disclosed in the Savi patent.

Q.    And that was one of Axcess's goals in filing the continuing application that became the 868 patent?

A.    Yes, it was.

Q.    After reviewing the Savi 114 patent and prosecuting the 868 patent, could your firm have represented both Axcess and Savi if they came to you asking to represent these two patents?

A.    No.  I believe it would have been a conflict.

Q.    If Axcess had come to you in 2002 and asked you to prosecute this kind of continuing application for them that you ended up doing in 2010, would you have been able to do so for them?

M. J. Marcin, Esq.

A.   Yes.                                                    09:26

 <u>**Marcin, Michael (Vol. 01) - 04/01/2014**</u>                    **1 CLIP  (RUNNING 00:15:16.801)**

 Version 2014-04-30-1015



**BB-MARCIN**                        **31 SEGMENTS  (RUNNING 00:15:16.801)**

**1.  PAGE 26:13 TO 27:03  (RUNNING 00:00:35.167)**

          Do you have any experience in
interference proceedings before the Board of Patent
Appeals and Interferences?
     A.    I did not.
     Q.    Did your representation for Axcess
include any representation regarding the patent
interference process?
     A.    Not that I recall.
     Q.    Do you know who represented Axcess
regarding those issues if anyone?
     A.    I do not -- no, I don't.
     Q.    Did you recommend another attorney to
Axcess to handle potential interference actions?
00027:01              M. J. Marcin, Esq.
     A.    I don't believe that that issue ever
arose.

**2.  PAGE 32:13 TO 33:05  (RUNNING 00:01:06.500)**

     Q.    Have you served as counsel in connection
with the reexamination of the 963 patent of Axcess?
     A.    Yes, I have.
     Q.    Are you counsel of record in that matter
with the patent office?
     A.    Yes, I am.
     Q.    And tell me what that patent was about
in general.
     A.    It was also about radio frequency
identification tags.
     Q.    What's a reexamination proceeding?
     A.    A reexamination proceeding is a
proceeding where a party -- a party files new prior
00033:01              M. J. Marcin, Esq.
art against an already issued patent and claims
that that prior art invalidates the patent.
     Q.    And in the specific case of the 953
patent, who was alleging what?

**3.  PAGE 33:07 TO 33:14  (RUNNING 00:00:25.800)**

     Q.    In the reexamination proceeding?
     A.    A third party filed a reexamination
proceeding against the 953 patent.
     Q.    What is the outcome of the reexamination
proceeding?
     A.    The reexamination proceeding is ongoing.
     Q.    What did the Patent and Trademark Office
examiner conclude?

**4.  PAGE 33:16 TO 33:24  (RUNNING 00:00:34.650)**

     A.    The examiner issued a final office
action in the reexamination proceeding.
     Q.    In general, what did the final office
action hold?
     A.    That the claims were rejected based on

certain prior arts.

Q. So in other words, the 953 patent that Axcess had obtained in the view of the patent examiner was invalid, fair?

**5. PAGE 34:02 TO 34:03 (RUNNING 00:00:04.200)**

A. In view -- in view of the patent examiner, yes.

**6. PAGE 48:21 TO 49:03 (RUNNING 00:00:28.100)**

Q. You had described the significance of the 868 patent being a continuation patent. Let me see if I understand what you said.

One thing was that the priority date of a continuation patent was able to reach back in time and attach to the parent, in this case the 435 patent, right?

M. J. Marcin, Esq.

**7. PAGE 49:05 TO 49:10 (RUNNING 00:00:19.200)**

A. The answer is it could reach back to the parent application. I don't recall the number of the parent.

Q. There are several ways in which that can be significant, right, having an early priority date?

**8. PAGE 49:12 TO 49:25 (RUNNING 00:00:50.300)**

A. Yes.

Q. One of them is that in the patent prosecution process or the examination process, if it's a continuation patent, the examiner in looking for prior art only looks for prior art before the date of its early priority date, right?

A. That's correct.

Q. So in terms of the 868 patent, the relevant time period for prior art that the examiner would consider in deciding whether to allow the patent would be the period before July of 1999, right?

A. I believe that's what the examiner would do, yes.

**9. PAGE 51:13 TO 51:22 (RUNNING 00:00:37.400)**

Q. So back to my original question. What I was trying to get at was assuming you had everything else being equal, if Axcess had come to you in 2004 and asked you to do the same thing and you had done the same thing, you would expect basically the same results from the patent office, right?

A. I would say they would search the same prior art and that -- yes. That's what they would do.

**10. PAGE 58:25 TO 59:07 (RUNNING 00:00:31.200)**

Q. Before we took a break, we had talked

M. J. Marcin, Esq.

about your filing of the application, which was the 449 application that turned into the 868 patent, and you filed it I believe on or about October 27, 2009. And we have looked at the claims that were originally filed by you and then a preliminary

07 amendment.

**11. PAGE 60:19 TO 60:23 (RUNNING 00:00:17.300)**

Q. Can you tell me what Exhibit 318 is?
A. It's an office action.
Q. And by this office action,, the patent office has rejected the claims that you filed for Axcess on the 449 application, true?

**12. PAGE 60:24 TO 60:24 (RUNNING 00:00:01.356)**

A. Yes.

**13. PAGE 60:25 TO 61:16 (RUNNING 00:01:04.400)**

Q. And the patent office explains in its
                    M. J. Marcin, Esq.
office action the reasoning behind its rejection, right?
A. The patent office typically will cite -- well, they will always cite the prior art, and then depending on the examiner, it depends on the level of specificity that it -- that it -- that the examiner calls out in the office action.
Q. And this examiner is named Mr. Ott?
A. Yes.
Q. And he cites numerous prior patents, US patents that he thinks require the rejection of the application that you filed?
A. In this case he cited one -- two patents for most of the claims and then a third patent for the Claim 41.

**14. PAGE 64:17 TO 64:25 (RUNNING 00:00:30.706)**

Q. But in any event, in the office action attached to Exhibit 321, the patent examiner issued a final rejection of the patent application, and that would be the amended one that you filed, right?
A. It would have been a rejection of the amended claims that we filed, yes.
Q. So this is now the second rejection that the patent examiners made?

**15. PAGE 65:03 TO 65:09 (RUNNING 00:00:14.100)**

A. It is the second office action that is issued in this application, yes.
Q. Well, it's a rejection, right?
A. Excuse me?
Q. It's a rejection?
A. Yes.
Q. And they rejected every claim?

**16. PAGE 65:10 TO 65:10 (RUNNING 00:00:02.381)**

A. It appears that that's correct.

**17. PAGE 67:19 TO 67:25 (RUNNING 00:00:26.000)**

Q. So as I see this process moving forward, the examiner rejects claims, you try to change them, add to them, take away from them, or otherwise modify them in a way that you hope the examiner will see in a different light and allow, right, and if the examiner rejects those, then you are going back and try to change it some more?

**18. PAGE 68:03 TO 68:17 (RUNNING 00:00:56.000)**

A.    So in this particular case, it appears that yes, we have along the way continued to amend the claims.  It doesn't always mean that we will amend the claims.  In some cases we will not, but in this case it appears that we do.  We have.

Q.    So far it hasn't worked with the examiner, right?

A.    Well, I would say that the -- I think one of the things that I would point out is that the examiner changed the prior art between the rejection, so our arguments I believe did overcome some of the prior art but the examiner found new pieces of prior art to assert against us.

Q.    So Exhibit 324 is another rejection by the examiner, right?

**19. PAGE 68:20 TO 69:02 (RUNNING 00:00:25.100)**

A.    Yes.  It appears that the examiner again changed the prior art that he asserted against us from the previous office action.

Q.    The patent office has now rejected all of the claims that you are asserting now again for the third time?

M. J. Marcin, Esq.

A.    Yes, that's correct.  Very typical.

**20. PAGE 74:15 TO 74:16 (RUNNING 00:00:05.100)**

Did you do your very best for Axcess on this 868 patent?

**21. PAGE 74:18 TO 75:10 (RUNNING 00:00:55.000)**

A.    I always try my very best for all my clients.

Q.    So that's a yes?

A.    That's a yes.

Q.    Did you do everything you could think of to attempt to get a patent that would be broad enough to cover the Savi patents as they have been described to you?

M. J. Marcin, Esq.

A.    Different clients have differing views as to, you know, where we are in a -- in the prosecution scheme and so I -- I don't recall what the specific calculus was at the time that we submitted these claims.

Q.    Well, did you do your best to try to get as broad of a patent as the patent office would allow with regard to the claims that Axcess was interested in obtaining?

**22. PAGE 75:12 TO 76:06 (RUNNING 00:01:10.400)**

A.    Again, I can't tell you specifically that what we ended up with would be the broadest possible claims that we could have gotten.  I don't recall specifically the prior art that was cited.  I don't remember if the examiner -- if I thought the examiner was correct or if the examiner is incorrect.  It's very typical that clients make business decisions as to how far to push a particular patent and the claims.  We may have thought that it was that Axcess was entitled to broader claims than, in fact, issued in the 868 patent, but we thought that we would have to go

through appeal, which typically takes about three years these days to get these broader claims, and M. J. Marcin, Esq. it may have been we decided to just take these claims that were allowable, rather than continue to fight the longer process for broader claims. So I would say that I did my best with respect to the desires of the client at the time.

**23. PAGE 78:08 TO 78:19 (RUNNING 00:00:40.000)**

So this patent, the 868 patent was filed as an application in 2009, right?

A.    That's correct.

Q.    And it went through the examination process over three years and was finally issued as a patent in 2012, correct?

A.    That's correct.

Q.    When the claims were originally filed by you on behalf of Axcess, they were very broad and clearly would have encompassed the Savi patents that you had reviewed in connection with your representation of Axcess, correct?

**24. PAGE 78:21 TO 79:18 (RUNNING 00:01:26.619)**

A.    I don't know if they clearly would have encompassed. That was the intention.

Q.    Right. That was your intention when you filed those broad claims to begin with?

A.    That is correct.

M. J. Marcin, Esq.

Q.    And through the examination process on this application, the examiner repeatedly rejected the original applications and then -- the original claims rather and then the amended claims until the final six claims were presented that were allowed in 2012, right?

A.    Yes.

Q.    And each of the six claims that were allowed in the 868 patent has as a required element that there be a wake-up signal signature wherein the wake-up signal signature is a digital bitstream; is that true?

A.    That's what the claims say, yes.

Q.    So if a device or product by another company does not use a wake-up signal signature which is a digital bitstream, it does not infringe this patent, true?

**25. PAGE 79:21 TO 80:03 (RUNNING 00:00:30.900)**

A.    So those are the words of the claim, and so to infringe this claim, you would have to do, either directly or by equivalence, all the words of these claims.

Q.    And do you know now or did you know at M. J. Marcin, Esq. the time that no Savi product uses a digital bitstream wake-up signal signature?

**26. PAGE 80:05 TO 80:07 (RUNNING 00:00:04.910)**

A.    I am not aware.

Q.    You have never been aware of that?

A.    I am not aware of that.

**27. PAGE 80:08 TO 80:11 (RUNNING 00:00:10.700)**

> Q. If no Savi product uses a digital bitstream wake-up signature, then Savi products don't infringe on this patent unless there is some argument about equivalence, right?

**28. PAGE 80:14 TO 80:17 (RUNNING 00:00:13.600)**

> A. So again, I think I answer in the same way is that in order to infringe these claims, you have to practice each and every element of the claims or their equivalence.

**29. PAGE 88:22 TO 88:24 (RUNNING 00:00:13.277)**

> Q. Have you been asked by Axcess to assert any claims or demands based on any of Axcess's patents against any other companies?

**30. PAGE 89:03 TO 89:05 (RUNNING 00:00:15.100)**

> A. No.
> Q. Are you aware whether Axcess has ever asserted the 868 patent against any other party?

**31. PAGE 89:08 TO 89:08 (RUNNING 00:00:01.335)**

> A. No.

**TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:15:16.801)**

Q. Just a few questions, Mr. Marcin. I will try and be quick.

Mr. Koning talked to you about a reexamination procedure that's ongoing in one of the Axcess patents. That procedure has not been completed yet, has it?

A. No.

Q. Mr. Koning also talked to you a lot about office actions and rejections specifically involving the prosecution of the 868 patent.

Are office actions and rejections a fairly common procedure in patent prosecution?

A. They are very common. It's basically what I do, day in and day out, is respond to office

TAB 3

M. J. Marcin, Esq.

actions.  That is very typical -- you know, the prosecution of the 868 patent I would call as a very typical path through the patent prosecution procedure.

Q.   So just because the patent examiner rejected certain claims doesn't mean that Axcess wasn't able to get a patent in the end?

A.   No.  As I said in my initial testimony, it's very typical.  In fact, we would find it an affront if we did not receive any objections of the claim because we probably should have drafted the claims to be broader than they were.

Q.   And I just want to recap real quickly what your representation was for Axcess and what you did relative to the prosecution of the 868 patent.

What was your understanding of what Axcess wanted to do relative to the prosecution of what became the 886 patent?

A.   My understanding was as I described that they wanted to cover other competitors' products.  The one that I specifically recall was Savi, and how that was described to me was by reading the Savi patent that we referred to before and also to

M. J. Marcin, Esq.

get -- I think I said before to sort of the heart    11:14
of what the invention -- what Axcess thought their    11:14
invention was which was the dual frequency aspect    11:14
of the -- of the invention, and therefore, we were    11:14
drafting claims with that in mind also.    11:14

Q.    And part of the heart of the Savi 114    11:14
patent was also dual frequency RFID technology?    11:14

A.    I believe that the title of that patent    11:14
is method apparatus for tracking items using dual    11:14
frequency tags.    11:14

Q.    Just to be clear, you mentioned Savi's    11:14
products but you never actually saw one of Savi's    11:15
products?    11:15

A.    Not that I recall.    11:15

Q.    So when you were looking at the Savi 114    11:15
patent, were you looking at the claims of that    11:15
patent?    11:15

A.    I was looking at the entire patent.  I    11:15
was looking at the description and the claims.    11:15

Q.    Is it your opinion that you were able to    11:15
meet your client's goal in this case of getting    11:15
them a patent that would read on Savi's 114 patent?    11:15

A.    I have not gone back and specifically    11:15

M. J. Marcin, Esq.

reviewed the claims but that was the goal of -- one    11:15

of the goals of the prosecution of this                11:15

application.                                           11:15

 **Steeves, Wayne (Vol. 01) - 07/12/2012**          **1 CLIP  (RUNNING 00:19:53.921)**

 Version 2014-05-08-1330



**BB-STEEVES**          **43 SEGMENTS  (RUNNING 00:19:53.921)**

### 1. PAGE 9:12 TO 9:14  (RUNNING 00:00:05.600)

> Could you please state your full name and address for the record?
> A      Wayne E. Steeves.

### 2. PAGE 31:13 TO 31:22  (RUNNING 00:00:30.072)

> Q      Okay.  And when you joined Axcess the president was a gentleman named Harry Budow?
> A      That's correct.
> Q      Did Axcess at that time have any experience or work in the RFID area?
> A      Not to my knowledge.  They were more involved in dye sublimation printing of cards, which may have contained RFID from somebody like HID or something like that.  That would be the extent.

### 3. PAGE 32:19 TO 32:22  (RUNNING 00:00:18.700)

> Q      And how long did you continue to work at Axcess?
> A      I believe, and I've declared it here, that I left in early 2003.

### 4. PAGE 38:20 TO 38:22  (RUNNING 00:00:06.282)

> Q      Which Baker Botts lawyers did you have dealings with?
> A      Terry Stalford.

### 5. PAGE 39:12 TO 39:23  (RUNNING 00:00:32.500)

> Q      And did you get along okay with Terry Stalford?
> A      I did.
> Q      Did you have any problems communicating with him, or did you think he understood what you were trying to say?
> A      Terry was very good about that.  We'd sit around the conference table and I would disclose the concept of the various inventions, and then they would ask some questions.  And then they would go away and write up a description, and the description was usually pretty accurate.

### 6. PAGE 40:17 TO 40:20  (RUNNING 00:00:11.200)

> Q      Did you ever have any interactions with anyone at Baker Botts other than on matters relating to patents?
> A      Not that I recall.

### 7. PAGE 44:04 TO 44:08  (RUNNING 00:00:17.700)

> Q      When you did have questions about various matters relating to the patent process or your patent applications, was Terry Stalford responsive, in general?

A    Yes.

**8. PAGE 52:02 TO 52:10  (RUNNING 00:00:36.813)**

Q    When you would make comments -- or would you make comments or ask questions from time to time with regard to a draft that was prepared?
A    Yeah, of course.  And I was very pleased with Terry's ability to comprehend the technical aspects of what we went over in the specifications. So I had very few times when I really had to comment or make changes in that side of the document, so.

**9. PAGE 52:21 TO 53:05  (RUNNING 00:00:29.871)**

Q    And when you would raise comments regarding the content of the drafts, do you ever recall not getting a response?
A    What time period?
Q    Ever.
A    Oh.  On the initial submissions?
Q    Yes.  On the draft of the patent application?
A    No.  Terry was responsive.  That was a big change between Fenwick & West.

**10. PAGE 55:03 TO 55:07  (RUNNING 00:00:14.990)**

Q    Are you aware of any instance in which you alerted Baker Botts to an error or inaccuracy to any patent applications which they then didn't correct?
A    I can't recall any.

**11. PAGE 63:12 TO 64:03  (RUNNING 00:00:43.900)**

Q    So is it fair to say by the time that an application was filed on one of your Axcess patents, you were aware or had a reasonable opportunity to become aware of the contents of the application?
A    Sure.  Yeah.
Q    And you had an opportunity to comment on the application and ask questions about it?
A    Throughout the process, I would say.
Q    And before it was filed, you had approved the filing of the application?
A    I can't say in every case, but that would seem to be a standard procedure.
Q    Are you aware of any case in which you didn't approve the filing of an application before it was filed?
A    I just don't recall.

**12. PAGE 68:06 TO 68:19  (RUNNING 00:00:39.500)**

Q    Did you ever complain while you were at Axcess -- let me start that again.  While you were at Axcess, did you ever complain or express dissatisfaction to Baker Botts about anything Baker Botts did?
A    Not that I recall.
Q    Did you ever express complaints or dissatisfaction about Baker Botts to anyone at Axcess while you were there?
A    Not that I recall.
Q    Did anyone else at Axcess express complaints or dissatisfaction with Baker Botts

while you were there?

A    Not that I recall.

**13.  PAGE 94:10 TO 94:22  (RUNNING 00:00:39.100)**

Q    Okay.  Now, when you started using Baker Botts when you came to Axcess, you knew that Baker Botts was a large law firm, right?

A    I had never heard of Baker Botts before, but somebody told me it was a large law firm and that they occupied one of those skyscrapers downtown Dallas, so I assumed they were a large law firm.

Q    Did you come to find that they had many patent lawyers representing clients all over the country?

A    I can't say that I did.  I just assumed that would be the case.

**14.  PAGE 95:09 TO 95:11  (RUNNING 00:00:11.200)**

Q    To your knowledge did anyone at Axcess ask Baker Botts not to represent any client or a group of clients?

**15.  PAGE 95:13 TO 95:13  (RUNNING 00:00:03.010)**

A    To my knowledge, I would have to say no.

**16.  PAGE 114:13 TO 115:07  (RUNNING 00:01:13.800)**

Q    When you -- getting back to Savi.  You said that at some point you heard from a dealer about a Savi product, and then you looked it up on the Savi website?

A    I don't recall.  It could have been a press release that he sent to us, it could have been a data sheet, it could have been a website.  I don't recall.  Eventually I did look it up on the Web, I can tell you that, but.

Q    What else did you do to investigate this product?

A    I attempted to dig a little bit deeper. I went to the FCC site, I went to -- because I wasn't sure that they were infringing.  You know, I could only state that it sure looked like it.  And then the product was, the way it operated and everything else, was identical, but...  So I looked at the FCC, I probably checked the USPTO website to see if there were any patents filed by Savi. Looked at the Savi website.

**17.  PAGE 115:08 TO 115:21  (RUNNING 00:00:49.158)**

Q    Anything else that you can recall?

A    What date was that?  That was 2002.

Q    Yeah.  May 2002, or earlier.

A    Yeah.  There were payment issues and that kind of thing with Axcess at the time, so I was trying to see if we could buy some Savi product.  And that didn't work.  I probably asked a dealer or two to see if they could just send us some Savi product, and that didn't work.  So none of my avenues panned out for further investigation.

Q    So when you say there were payment issues, whose payment issues?

A    Axcess was having financial trouble at the time.

**18. PAGE 117:14 TO 118:03 (RUNNING 00:00:59.424)**

> Q    And you say you looked at the USPTO
> website for Savi patents?
> A    Mm-hmm.
> Q    Did you do that only once?
> A    I don't recall.
> Q    Do you recall ever looking for Savi
> patents other than when you first saw this
> potential infringement?
> A    I believe I -- to the best of my
> recollection, I believe I went to the USPTO site
> and entered Savi as the assignee to see if they had
> any patents issued.  Obviously, I either didn't see
> any Savi patents or the Savi patents that existed
> did not disclose any infringement.  But I don't,
> you know, I don't recall the details of all that.

**19. PAGE 122:05 TO 123:02 (RUNNING 00:00:58.662)**

> Q    Did you ever discuss, to your
> recollection, with Terry Stalford or anyone else at
> Baker Botts that Baker Botts couldn't afford to
> take on any new matters or do new work for Axcess
> until Axcess cleared up its past due bills?
> A    I don't recall.  I did discuss with
> Terry at some point, when he made the offer that he
> couldn't do any more work but he would answer quick
> phone calls for me, you know, without incurring any
> charges or fees.
> Q    Without charging for it?
> A    Yes.
> Q    Just as a courtesy?
> A    Yeah.
> Q    And did he do that for you?
> A    He did.
> Q    Up to a certain point?
> A    I don't know when, but he did.  I don't
> know the time frames.  It could be 2001 into 2002.
> It could be -- I don't know.
> Q    Did --
> A    Could have been a month, four months.
> No idea.

**20. PAGE 123:08 TO 123:10 (RUNNING 00:00:12.500)**

> Q    So tell me all the communications you
> had with anybody at Baker Botts regarding Savi.
> A    None.  Even to this day.

**21. PAGE 123:19 TO 123:22 (RUNNING 00:00:11.600)**

> Q    And to your recollection there were no
> oral communications regarding infringement between
> you and Baker Botts?
> A    To the best of my recollection, yeah.

**22. PAGE 124:07 TO 124:20 (RUNNING 00:00:35.646)**

> Q    And you never entered into agreement --
> an agreement with Baker Botts whereby Baker Botts
> agreed to represent Axcess on infringement or
> licensing matters?
> A    I can say the answer is no because I
> didn't have the capability or the capacity to enter
> into any agreements of that nature.
> Q    Did anyone at Axcess tell you that Baker
> Botts had entered into such an agreement?
> A    No.

Q   Did anyone at Baker Bott -- anyone at Axcess ever tell you that Baker Botts had agreed to represent Axcess on anything having to do with Savi?

**23.   PAGE 124:22 TO 124:22  (RUNNING 00:00:02.900)**

A   Not that I recall.

**24.   PAGE 127:17 TO 127:20  (RUNNING 00:00:12.986)**

Q   You sent an e-mail to Mr. Griebenow regarding Savi Technology.  And if you'd look at what I've marked as Exhibit 252, in the middle of the page you'll see that e-mail.

**25.   PAGE 127:23 TO 128:09  (RUNNING 00:00:56.400)**

Q   Do you see it?
A   Yes.
Q   Why did you -- well, let me take a step back.  It appears that it is a draft of a demand to Savi Technology.  Am I reading that correctly?
A   This was probably a copy that -- what I think this is, is I was asked to write up something that we might use to submit to Savi directly or something.  And then I looked online and got some legalese, if you will, and copied that and then sent it back to them, and I'm asking them how aggressive do you think we should be, you know.

**26.   PAGE 129:24 TO 130:01  (RUNNING 00:00:04.347)**

Q   Right.  You didn't send this draft to Baker Botts, right?
A   No.

**27.   PAGE 130:06 TO 130:09  (RUNNING 00:00:17.200)**

Q   Okay.  And then on June 13th, a couple of days later, you sent an e-mail to Mr. Griebenow, Mr. Frank, and Ms. Keith, which has been marked as Exhibit 253.  Please take a look at that.

**28.   PAGE 130:12 TO 131:16  (RUNNING 00:01:33.368)**

A   Yes, I'm looking at it.
Q   All right.  And that says in its entirety -- it's called "Power of Attorney."  I have found at least one -- I'm sorry.  I have at least found one of the power of attorney assignments to Baker Botts.  They were all the same -- they were all of the same form.  I intend on contacting the patent office and revoking such power for all patent submissions related to Baker Botts for both video and RFID.  Is this still a correct course of action?  Wayne.
        Now, what prompted you to send this e-mail?
A   I don't recall.
Q   Were you asked by Mr. Griebenow or Mr. Frank to contact the patent office and revoke Baker Botts' powers of attorneys?
A   I don't know if Terry Stalford contacted me and said, you know, because of payment issues we're -- I'm not going to be able to help you anymore, or if it originated from Allan Griebenow or Allan Frank.  I have no idea.  I can't remember. I was obviously responding to somebody internally

and asking them if they were really sure that they wanted to revoke the power of attorney. That's what this was saying. That's all I know.

Q It says: Is it still a correct course of action? Had someone decided earlier that that would probably be the correct course of action?

A Well, that's what it implies.

**29. PAGE 142:03 TO 143:03 (RUNNING 00:01:36.432)**

Q All right. Well, turning the clock back a little bit into 2002, do you recall that the -- because of the payment problems getting so severe, Axcess was taking back -- taking in-house the patent files that Baker Botts had?

A I'm sure I had some awareness of that but I don't recall.

Q Okay. I'm going to show you a couple of things --

A I just read on -- yes. September 4th, 2002, on Exhibit 254. Right? 254? Yeah. Page 3 on 7102 I guess is the reference, on the bottom of the second category, it says, "Baker Botts has agreed to provide us with all correspondence and has done so. They have also agreed to provide telephone advice free of charge and have requested that we keep their dockets up to date with any responses on our behalf."

Q So what did that mean to you?

A This would be related to the conversation I might have had with Terry that he says, yeah, just if you got questions, give me a call and I'll help you out whenever I can.

Q But they weren't actually going to be doing substantive work?

A No substantive work.

**30. PAGE 150:23 TO 150:25 (RUNNING 00:00:09.299)**

Q Is it true that the only lawyers you ever spoke with about potential infringement by Savi are the lawyers at Haynes and Boone?

**31. PAGE 151:02 TO 151:10 (RUNNING 00:00:28.000)**

A Spoke with.

Q Spoke with.

A Not e-mailed --

Q Right.

A -- spoke with. Obviously I had a meeting with Haynes and Boones, from what's been described here, but I have no recollection of it. So I would say from a -- from that time frame, that would be the only attorneys I spoke to.

**32. PAGE 151:18 TO 151:23 (RUNNING 00:00:19.000)**

Q And while you were at Axcess, was there anyone else inside the company who had as much familiarity with RFID patents and patent applications for Axcess as you did?

A I would have to say that I carried the brunt of that knowledge.

**33. PAGE 190:02 TO 190:04 (RUNNING 00:00:06.300)**

Q Is this an e-mail regarding -- from you to Mr. Griebenow regarding the Savi contract?

A It appears to be.

**34. PAGE 190:07 TO 190:18 (RUNNING 00:00:37.825)**

Q    Did you tell Mr. Griebenow that you suggested Axcess acquire a compliant -- I'm sorry. You suggest that Axcess acquire compliant-Savi equipment for analysis if possible.
A    Do I say that in here?  Let's see.
Q    Second paragraph.
A    Yes.
Q    Did you ever obtain Savi equipment?
A    No.
Q    Did Axcess ever follow your suggestion and obtain Savi equipment?
A    No.

**35. PAGE 190:20 TO 190:20 (RUNNING 00:00:01.367)**

A    Not to my knowledge.

**36. PAGE 196:08 TO 196:12 (RUNNING 00:00:18.375)**

Q    Let me show you what's already been marked as Exhibit 208 to the deposition of Mr. Griebenow.  Is this an e-mail from you to Mr. Griebenow, dated July 26th, 2004?
A    Yes.

**37. PAGE 196:20 TO 197:05 (RUNNING 00:00:41.700)**

Q    And do you see in the second paragraph you're -- in the second-to-last sentence you say, "While Savi may still be arrogant and not see such advantages, Axcess could use the patent violations as a lever to get invited in."
A    I see that.
Q    And do you recall having any reaction from Mr. Griebenow about this additional e-mail about Savi's patent violations?
A    I don't recall Allan getting excited about any of this DoD work.

**38. PAGE 197:12 TO 197:20 (RUNNING 00:00:28.535)**

Q    So you've continued, as we've seen in the past couple of exhibits that you're writing him about patent infringement but you're not getting any response from him?
A    I'm writing him about the potential of using that to gain some momentum in the market.
Q    Well, for whatever use, he didn't respond to you about Savi's patent infringements?
A    I don't know if he did or didn't.

**39. PAGE 201:04 TO 201:08 (RUNNING 00:00:16.400)**

Q    Were you aware at any time prior to today that Axcess entered into a license agreement with Savi?
A    I was not aware of it even up to this minute.

**40. PAGE 222:19 TO 222:21 (RUNNING 00:00:17.661)**

Q    To the best of your knowledge, did Baker Botts make any mistake in connection with the handling of the 603 patent?

**41. PAGE 222:23 TO 223:08 (RUNNING 00:00:23.208)**

A    To the best of my knowledge, I don't

know of any mistakes on -- obviously, I'm not with the organization, I'm not evaluating their patents, I'm not looking at things of that nature. So, you know.

Q   Well, you dealt with Baker Botts, though --

A   I was --

Q   You were the inventor --

A   As I testified earlier, I was very happy with Terry Stalford's work in the time frame.

**42. PAGE 229:04 TO 229:07  (RUNNING 00:00:09.790)**

Q   To the best of your recollection, every time you asked Baker Botts to draft a patent application on one of your invention, they did it?

A   Yeah.

**43. PAGE 229:14 TO 229:18  (RUNNING 00:00:11.600)**

Q   And you reviewed the patents -- patent applications both before and after, or at least you had an opportunity to do so?

A   I would have been given the opportunity to do so, yeah.

> **TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:19:53.921)**

 **Beber, Michael (Vol. 01) - 06/20/2012**                    **1 CLIP  (RUNNING 00:09:27.080)**

 Version 2014-05-11-1215



**BB-BEBER**                    **27 SEGMENTS  (RUNNING 00:09:27.080)**

### 1.  PAGE 5:20 TO 6:02  (RUNNING 00:00:22.511)

Q.   Good morning, Mr. Beber.  My name is Paul Koning and I represent Baker Botts law firm in this case that's been filed by Axcess.

Could you, for the record, please state your name and your home address.

A.   My name is Michael Henry Beber.  I live at 3101 Forester Way, Plano, Texas, 75075.

Q.   Thank you.

### 2.  PAGE 11:21 TO 11:24  (RUNNING 00:00:10.994)

Q.   What have your job titles been at Axcess?

A.   Senior engineer, engineering manager.

Q.   And are you still employed by Axcess today?

A.   Yes, I am.

### 3.  PAGE 24:10 TO 24:18  (RUNNING 00:00:24.600)

At any time during your employment at Axcess, did you ever have any complaints about Baker Botts?

A.   Any complaints?

Q.   Yes.

A.   Did I complain to them or did they complain to me?

Q.   No.  Did you have any complaints about the way Baker Botts did its job?

A.   I don't recall any complaints.

### 4.  PAGE 27:08 TO 27:10  (RUNNING 00:00:14.507)

Q.   Were you aware that in 2002, Baker Botts told the company that, We can't take any more work for you until you pay our bills?

### 5.  PAGE 27:12 TO 27:12  (RUNNING 00:00:02.416)

A.   I believe so.

### 6.  PAGE 29:16 TO 29:20  (RUNNING 00:00:22.741)

Q.   To your knowledge, Mike Beber, did Baker Botts ever do a single thing related to Savi?

A.   Unaware of any.

Q.   And to your knowledge, did Baker Botts ever agree to do anything related to Savi?

### 7.  PAGE 29:22 TO 29:22  (RUNNING 00:00:01.721)

A.   Unaware of any.

### 8.  PAGE 46:11 TO 46:17  (RUNNING 00:00:34.194)

Q.   Let me show you what's been marked Exhibit 130.  Is this your e-mail -- I'm sorry.  Is this your letter dated February 17th to Mr. Stalford?

A.   Again, it has my name on the bottom.

Q.   And do you recall that on or around February 17th, you retained Mr. Stalford at Baker Botts for the

TAB 5

three patent applications that are listed there?

**9. PAGE 46:19 TO 46:20  (RUNNING 00:00:04.500)**

A.   According to the patent, yes -- according to the e-mail, yes.

**10. PAGE 47:03 TO 47:05  (RUNNING 00:00:04.951)**

Q.   Did you ask them to do anything else other than these three patents at this time?
A.   I'm unaware of that.

**11. PAGE 48:05 TO 48:08  (RUNNING 00:00:09.708)**

Q.   So the record is clear, you were in charge of patents at Axcess between the time Mr. Steeves left and the time Mr. Bridgelall arrived?
A.   Yes, sir.

**12. PAGE 66:25 TO 67:19  (RUNNING 00:01:13.713)**

Q.   All right.  Let me show you what's been marked as Exhibit 182, ask if this is an e-mail you wrote to Mr. Frank on December 9th, 2004?
A.   That's what the e-mail states.
Q.   And it says that you've been speaking with a group -- appears to be the Nerac group that provides searches, prior art, technical, patent as a service.  They provide one free to demonstrate the service.  I wondered if there was some benefit to run our RFID against other patents (Savi) to find specific infringements.
Did you ever have any further communications about your proposal to use the Nerac service to search for specific infringements?
A.   Yes.
Q.   What was -- what communications did you have?
A.   We hired them, Nerac, for a short term.
Q.   And so you not only did the free service, you actually hired them?
A.   Yes.

**13. PAGE 83:08 TO 83:13  (RUNNING 00:00:33.900)**

Q.   (BY MR. KONING)  Okay.  Mr. Beber, I'm going to hand you what's marked as Exhibit 192.  It's an e-mail from you to Mr. Griebenow dated October 24th, 2005 with some attachments to it, and the attachment is called ASIC worksheet.  Do you see that?
A.   Yes.

**14. PAGE 84:13 TO 85:12  (RUNNING 00:01:15.700)**

Q.   Under the item that says Multi Frequency Tag, there's a listing of various frequencies.  Do you see that?
A.   Yes.
Q.   315 megahertz, 433 megahertz and 126 kilohertz?
A.   Yes.
Q.   Under 433 megahertz, it says that the advantages -- that it's the standard frequency in use throughout most of the world.
Do you see that?
A.   Yes.
Q.   Do you agree with that statement?
A.   To the best of my knowledge, yes.
Q.   And under the 126 kilohertz -- let me ask you

about the 126 kilohertz. Was Axcess using the 126 kilohertz as its low frequency -- for low frequency communications on its tags?

A. For the low frequency wake-up, yes.

Q. Wake-up.

Did Axcess use 132 kilohertz for low frequency wake-up on its tags?

A. At one time, yes.

Q. And when did that change?

A. I don't recall specific dates.

**15. PAGE 85:22 TO 86:13 (RUNNING 00:01:03.274)**

Q. And do you remember why you made that change?

A. Due to clock frequencies requiring it to be closer to 126 than 132.

Q. You're going to have to help me. What do you mean "clock frequencies"?

A. The processor clock frequency. The division process -- the processor itself has its own clock, and the divisions in the clock came down to a frequency that was closer to 126 kilohertz than it was to 132 kilohertz.

Q. I see. And where did the processor come from?

A. The processor was an off-the-shelf device.

Q. So is it fair to say that the decision to use 126 kilohertz as the low frequency wake-up was driven by the characteristics of the off-the-shelf processor that you decided to use for the tags?

A. Yes.

**16. PAGE 87:02 TO 87:05 (RUNNING 00:00:11.495)**

Q. It's simply a matter of matching the clock speed of the processor that you decide to buy off the shelf to put in the chip?

A. In our case, yes.

**17. PAGE 94:08 TO 94:10 (RUNNING 00:00:06.700)**

Q. Now, did you have anything to do with the hiring of Raj Bridgelall?

A. I did not.

**18. PAGE 94:18 TO 94:22 (RUNNING 00:00:13.585)**

Q. What did you understand his job to be?

A. Vice president of engineering.

Q. Was he then to be in charge of you and others in the engineering department?

A. Yes.

**19. PAGE 95:01 TO 95:13 (RUNNING 00:00:50.300)**

Q. Do you know why he left?

A. Not getting paid.

Q. Did you transfer to Mr. Bridgelall your patent portfolio administration duties when he came aboard?

A. Yes, I did.

Q. Let me show you what's been marked already as Exhibit 137, and this, I'll represent to you, is pretty soon after Mr. Bridgelall came on board. And you can see by your e-mail at the bottom of the page, it says, Hi Brian, we have been very busy here and now have added a CTO.

And the CTO is Mr. Bridgelall?

A. Yes, it is.

**20. PAGE 97:23 TO 98:02 (RUNNING 00:00:28.249)**

Q. Did you ever mention to Baker Botts that for Axcess to continue representing -- did you ever mention to Mr. Oaks or anybody else at Baker Botts that for Axcess to continue employing Baker Botts, Baker Botts would have to agree not to represent certain companies?

**21. PAGE 98:04 TO 98:06 (RUNNING 00:00:08.349)**

A. No, sir.
Q. Did you ever provide a list of prohibited representations to Baker Botts?

**22. PAGE 98:08 TO 98:11 (RUNNING 00:00:12.700)**

A. I don't recall any.
Q. Did anyone at Axcess, to your knowledge, do so?
A. I wouldn't know.

**23. PAGE 99:16 TO 99:17 (RUNNING 00:00:05.714)**

Q. Did you think that in your dealings with Baker Botts, they did a good job?

**24. PAGE 99:19 TO 99:20 (RUNNING 00:00:04.156)**

A. They did what they were supposed to for Axcess at the time.

**25. PAGE 101:16 TO 101:18 (RUNNING 00:00:09.527)**

Q. Are you aware of any facts that would suggest that Baker Botts' representation of Savi harmed Axcess in any way?

**26. PAGE 101:20 TO 101:22 (RUNNING 00:00:11.305)**

A. I personally am unaware.
Q. To your knowledge, did Baker Botts make any mistakes in writing any of Axcess' patent applications?

**27. PAGE 101:24 TO 101:25 (RUNNING 00:00:05.570)**

A. Again, to my knowledge I have not experienced anything.

> **TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:09:27.080)**

 **Bridgelall, Raj (Vol. 01) - 06/19/2012**              **1 CLIP  (RUNNING 00:16:22.715)**



Version 2014-05-11-1215

**BB-BRIDGELALL**                    **40 SEGMENTS  (RUNNING 00:16:22.715)**

**1. PAGE 5:20 TO 5:21  (RUNNING 00:00:02.783)**

> Q.   Good morning, Mr. Bridgelall.
> A.   Morning.

**2. PAGE 19:02 TO 19:03  (RUNNING 00:00:06.600)**

> Q.   And when did you start at Axcess?
> A.   Around August or September of '06.

**3. PAGE 20:19 TO 20:25  (RUNNING 00:00:16.943)**

> Q.   So as part of your job, are you in charge of
> the intellectual property portfolio?
> A.   Yes.
> Q.   Keeping track of what was in it?
> A.   Yes.
> Q.   And if there was going to be new patents
> applied for, that would go through you?

**4. PAGE 21:02 TO 21:02  (RUNNING 00:00:00.900)**

> A.   Yes.

**5. PAGE 21:07 TO 21:10  (RUNNING 00:00:10.935)**

> Q.   Are you aware of any patents that were applied
> for by Axcess while you were there other than the ones
> that went through you?
> A.   While I was there, no.

**6. PAGE 23:10 TO 24:01  (RUNNING 00:01:06.100)**

> Q.   And was it your job to recommend what
> direction the company should go in from a technological
> standpoint?
> A.   From -- yes, technological standpoint.
> Q.   Was it your job to review the existing
> technology that the company had as part of that
> evaluation?
> A.   Yes.
> Q.   Was it your job to review proposed technology?
> A.   I felt it was my job.
> Q.   What about proposed patents?
> A.   Proposed from whom?
> Q.   Anybody at Axcess.  Somebody said, here's an
> invention, I'd like Axcess to patent it, was that part
> of your job to evaluate whether Axcess should incur the
> expense of attempting to patent an invention?
> A.   My job was to evaluate the proposal, yes.

**7. PAGE 27:25 TO 28:10  (RUNNING 00:00:54.581)**

> Q.   Okay.  Now, you left Axcess when?
> A.   In 2010.
> Q.   Do you remember what --
> A.   September or October 2010.
> Q.   And why did you leave?
> A.   I was offered a position with the university,
> and in addition to that, there was a period of lack of

TAB 6

payment, salaries, and it became difficult so I left.

Q. For how long were you unpaid by Axcess?

A. Oh, let's see. Probably about a couple of months. Six weeks, couple of months.

**8. PAGE 41:24 TO 42:08  (RUNNING 00:00:36.807)**

Q. Did you ever talk about anything having to do with AeroScout or Savi with anyone at Baker Botts?

A. No.

Q. Okay. Did -- let's put aside the AeroScout complaint and what discussions you had about the AeroScout complaint with Mr. Griebenow or anybody else at Axcess.

Other than that, did anyone at Axcess ever tell you that Baker Botts had made a mistake or had not done what it was asked to do?

**9. PAGE 42:13 TO 42:25  (RUNNING 00:00:37.841)**

Q. Anytime before the filing of the lawsuit in this case.

A. No, I don't remember that.

Q. Did you ever reach that conclusion on your own that Baker Botts had made a mistake?

A. I never concluded anything.

Q. Well, you worked with Baker Botts on getting new patents for the company, right?

A. Yes.

Q. And in your observation, did they ever make a mistake on anything they did for you?

A. Not to my knowledge anything they did for me, no.

**10. PAGE 43:01 TO 43:17  (RUNNING 00:00:56.100)**

Q. And I think you said this already, but I just want to make sure. You never told or suggested to anybody at Baker Botts that Baker Botts had made any sort of a mistake?

A. No.

Q. Or that Axcess was unhappy with Baker Botts?

A. No.

Q. Did you ever ask Baker Botts who else in the RFID area the firm represented?

A. Never discussed with Baker Botts anything related to this.

Q. Did you ever tell Baker Botts that Axcess wouldn't use the firm if the firm represented anybody else who did RFID?

A. I don't remember anything like that, no.

Q. When you worked with other lawyers in the past, have you ever made that sort of a request?

**11. PAGE 43:19 TO 43:21  (RUNNING 00:00:08.424)**

A. No.

Q. Did you ever give Baker Botts a list of companies that Axcess didn't want it to represent?

**12. PAGE 43:23 TO 44:03  (RUNNING 00:00:15.100)**

A. No.

Q. Did you ever reject any invoice that Baker Botts sent?

A. Did I ever --

Q. Reject an invoice.

A. No.

**13. PAGE 44:16 TO 45:02 (RUNNING 00:00:47.100)**

Q. During your employment with Axcess, at any time did you mention Savi to Baker Botts?
A. No.
Q. Now, you knew some people that worked at Savi, right?
A. Yes.
Q. And soon after you joined the company, you advocated to Mr. Griebenow that the company should consider looking at licensing some technology from Savi. Do you remember that?
A. I probably -- I don't remember specifically recommending that, but I probably did.

**14. PAGE 45:07 TO 45:09 (RUNNING 00:00:04.950)**

Q. And eventually Axcess entered into a license with Savi, right?
A. Yes.

**15. PAGE 45:14 TO 45:16 (RUNNING 00:00:09.400)**

Q. You never talked with Baker Botts about licensing from Savi, did you?
A. Never talked to Baker Botts about that.

**16. PAGE 68:02 TO 68:04 (RUNNING 00:00:11.513)**

Q. Were you ever told by anyone at Axcess that Baker Botts had ever provided any representation to Axcess in any way related to Savi?

**17. PAGE 68:06 TO 68:10 (RUNNING 00:00:17.116)**

A. No. I don't remember that.
Q. Are you aware of a single shred of evidence, either e-mails or notes or conversations, that indicates that anyone at Axcess ever mentioned Savi to Baker Botts?

**18. PAGE 68:12 TO 68:12 (RUNNING 00:00:10.100)**

A. No, not aware.

**19. PAGE 69:12 TO 69:13 (RUNNING 00:00:07.476)**

Q. Did anyone ever tell you why Axcess didn't follow Haynes and Boone's advice?

**20. PAGE 69:15 TO 69:15 (RUNNING 00:00:01.073)**

A. No.

**21. PAGE 81:01 TO 81:08 (RUNNING 00:00:21.900)**

Q. Did Axcess try to get into the military market or the defense market when you were there?
A. I remember Axcess trying to sell to any market available. I don't remember particularly going after military market specifically.
Q. You don't recall that that was any kind of a focus of the company?
A. That was not necessarily a focus.

**22. PAGE 82:11 TO 82:14 (RUNNING 00:00:12.600)**

Q. Do you have any reason to believe that Axcess had anything to do whatsoever with Savi getting any government contracts?
A. I don't think so.

**23. PAGE 83:07 TO 83:12  (RUNNING 00:00:25.200)**

Q.   Who did Axcess consider to be its major competitor while you were there?
A.   Major competitor for Axcess while I was there? A company by the name of RF Code.
Q.   That was the primary competitor?
A.   As I can recall, yes.

**24. PAGE 112:11 TO 112:14  (RUNNING 00:00:11.684)**

Q.   Now, let me ask you about frequencies as they relate to RFID technologies.  Is it fair to say that throughout the world, frequency bands are tightly regulated?

**25. PAGE 112:16 TO 112:18  (RUNNING 00:00:13.988)**

A.   Frequency bands are regulated by the -- their respective governments.  Tightly, I'm not sure what that means.  They're regulated.

**26. PAGE 114:22 TO 115:05  (RUNNING 00:00:27.458)**

Q.   And you have as a low frequency 126 kilohertz. Is that what Axcess was using at this time?
A.   Yes.
Q.   Did Axcess ever sell products with 132?
A.   I don't think so.
Q.   So as far as you knew, all the time that you were working there, the low frequency employed within the Axcess products was 126 kilohertz?
A.   Yes.

**27. PAGE 124:03 TO 124:10  (RUNNING 00:00:23.900)**

Q.   And did you -- and you knew at this time that Axcess also had low frequency wake-up patents, right?
A.   Yes.
Q.   And when you received this or other information about the Savi license on the 18185 ISO standard, did you review the Savi patents that are listed here?
A.   Yes.

**28. PAGE 125:25 TO 126:02  (RUNNING 00:00:19.044)**

Q.   Let me show you what's been marked as Exhibit 146 and ask if you can identify this as an e-mail that you sent on or about May 17th, 2007.  Is that an e-mail

**29. PAGE 126:03 TO 127:05  (RUNNING 00:01:36.200)**

that you sent on May 17th, 2007?
A.   Yes.
Q.   Who did you send it to?
A.   Looks like I sent it to Allan Griebenow and Allan Frank.
Q.   And this is called a Savi licensing program details, right?
A.   Yes.
Q.   And there were two attachments to the e-mail, two zip files?
A.   Okay.
Q.   Yes?
A.   Apparently looks like it was, yes.
Q.   And the bottom of the e-mail, it reflects that Mr. Burns sent you information regarding the licensing program on May 17th as well?
A.   Yes.

Q. So all of the attachments to Exhibit 146 were transmitted by you to Mr. Griebenow and to Mr. Frank?

A. Yes.

Q. Now, if you look at the e-mail itself, you appear to summarize points that peaked your interest, right?

A. Yes.

Q. The second thing you note is that they cite four LF wake-up patents and then you say you've downloaded them, attached.

A. Yes.

**30. PAGE 127:16 TO 127:23 (RUNNING 00:01:23.300)**

Q. And the four Savi patents that are attached to this e-mail, could you identify which ones those are? And you can identify them just by the last three numbers of the patent number.

A. Okay. Looks like we have '392, '888, '484 and '114.

Q. So '392, '888, the '114 and the '484?

A. Yes.

**31. PAGE 130:14 TO 130:18 (RUNNING 00:00:14.700)**

Q. There's no question in anybody's mind, including yours, about what patents were being licensed if you were going to enter into a license with Savi on the 18185 standard, right?

A. They were clear patent numbers.

**32. PAGE 141:06 TO 141:24 (RUNNING 00:01:09.948)**

Q. Now let me show you what's been marked as Exhibit 150. It's an e-mail from you to Brian Oaks with a copy to Mr. Frank, right?

A. Okay.

Q. And the third paragraph says, As you may also be aware, Axcess will be transitioning the work to another firm. As such, please discontinue all appeals and filings.

A. Yes, I see that.

Q. I know we talked about this briefly before, and I think you testified that you didn't remember why Axcess was terminating Baker Botts, right?

A. Correct.

Q. Does this e-mail refresh your recollection in any way about --

A. I still don't -- no.

Q. Okay. No one told you, We're mad at Baker Botts or we think they're scoundrels or anything like that?

**33. PAGE 142:01 TO 142:01 (RUNNING 00:00:03.300)**

A. I don't remember that at all.

**34. PAGE 155:19 TO 156:06 (RUNNING 00:00:36.941)**

Q. And then you've got the '985 and the '727 patents, and you refer to those as tag-to-tag communications, correct?

A. Yes.

Q. And basically the -- those two patents, is it fair to characterize them as involving a tag that could serve both as a normal tag and also operate as a reader to communicate with other tags?

A. More of a communications conduit, not necessarily reader.

Q.   To function as a communications conduit to other tags --
A.   Yeah.

**35.  PAGE 156:15 TO 156:18  (RUNNING 00:00:16.309)**

Q.   Do you know whether Axcess ever sold any products that incorporated the tag-to-tag communications function?
A.   I do not think so.

**36.  PAGE 157:18 TO 158:04  (RUNNING 00:00:38.484)**

Q.   Was the basic concept underlying the tag-to-tag patent the ability to extend the range of the reader so that tags outside of the reader's range could report back to the reader?
A.   That was one benefit.
Q.   What was the other benefit?
A.   Power consumption, not having to plug into a separate power source.
Q.   Meaning that a tag would actually --
A.   Could be placed anywhere.
Q.   And wouldn't have to be plugged in?
A.   Yeah.

**37.  PAGE 170:21 TO 170:23  (RUNNING 00:00:09.581)**

Q.   Was the fact that Axcess did not sell any products to the government or the military at all the result of Savi?

**38.  PAGE 170:25 TO 171:01  (RUNNING 00:00:05.907)**

A.   In my opinion, there were no relationship between one or the other.

**39.  PAGE 173:10 TO 173:16  (RUNNING 00:00:25.700)**

Are you aware of or have you seen any evidence that Baker Botts pulled any punches when it represented Axcess at the same time it represented Savi?
A.   No.
Q.   Are you aware of any evidence or indication that Baker Botts shared any confidential Axcess information with Savi?

**40.  PAGE 173:18 TO 173:20  (RUNNING 00:00:04.729)**

A.   No, I'm not aware.
Q.   No?
A.   I'm not aware of anything.

**TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:16:22.715)**